# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 17-1029V
### Filed: February 19, 2019
UNPUBLISHED

| | |
|---|---|
| SHERYL ATTIG,<br><br>Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>Respondent. | Special Processing Unit (SPU); Decision Awarding Damages; Pain and Suffering; Tetanus, Diphtheria, Acellular Pertussis (Tdap) Vaccine; Shoulder Injury Related to Vaccine Administration (SIRVA) |

*Shealene Priscilla Mancuso, Muller Brazil, LLP, Dresher, PA, for petitioner.*
*Glenn Alexander Macleod, U.S. Department of Justice, Washington, DC, for respondent.*

## DECISION AWARDING DAMAGES[1]

**Dorsey**, Chief Special Master:

On July 31, 2017, petitioner filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*,[2] (the "Vaccine Act"). Petitioner alleges that she suffered a left shoulder injury caused by her Tetanus, Diphtheria, Acellular Pertussis ("Tdap") vaccination. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters and the undersigned issued a Ruling on Entitlement finding petitioner entitled to compensation for a Shoulder Injury Related to Vaccine Administration or "SIRVA." For the reasons

---

[1] The undersigned intends to post this decision on the United States Court of Federal Claims' website. **This means the decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access. Because this unpublished decision contains a reasoned explanation for the action in this case, undersigned is required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services).

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

discussed below, the undersigned now awards compensation in the amount of $76,386.97.

## I.   Procedural History

On July 31, 2017, along with her petition, petitioner filed medical records and an affidavit marked as Petitioner's Exhibits ("Exs.") 1-5.  (ECF No. 1).  Petitioner filed a Statement of Completion on August 1, 2017.  (ECF No. 6).

During the initial status conference held on September 26, 2017, the parties discussed conflicting information regarding the provider who administered the Tdap vaccination and the lack of medical records from petitioner's primary care provider ("PCP").  (ECF No. 10).  Petitioner's counsel stated that she would attempt to procure additional documentation regarding vaccination.  *Id.* at 1.  Regarding the lack of PCP records, she disclosed that petitioner's mother had acted as petitioner's PCP.  *Id.*  She added that she was not certain whether any medical records from this treatment existed or if petitioner's mother was a physician or other medical provider such as a nurse.  *Id.*  The parties discussed other evidence that could document petitioner's medical condition prior to and after vaccination, such as detailed affidavits from petitioner and her mother, informal notes, or calendar entries.  *Id.* at 1-2.

On October 12, 2017, petitioner filed the results from an MRI performed approximately one month earlier, on September 8, 2017.  (ECF No. 11).  The next day, she filed a detailed vaccination record and affidavits from herself and her mother, Elizabeth Attig, M.D.,[3] providing additional information regarding the primary care treatment provided by Dr. Attig.  *See* Exs. 7-9, filed Oct. 13, 2017 (ECF No. 12).

On May 10, 2018, respondent filed his Rule 4(c) Report in which he conceded that petitioner was entitled to compensation in this case.  (ECF No. 21).  The same day, the undersigned issued a ruling on entitlement finding petitioner entitled to compensation for her SIRVA.  (ECF No. 22).  Petitioner filed updated medical records, and the parties began the process of negotiating the appropriate amount of damages.  *See* Ex. 10 (ECF No. 20); Status Report, filed June 11, 2018 (ECF No. 24).

Approximately two months later, petitioner filed a joint status report noting that the parties had agreed to the amount that petitioner is entitled to for out-of-pocket medical expenses but disagreed on the amount for pain and suffering.  Status Report, filed July 10, 2018 (ECF No. 26).  Petitioner indicated that the parties had agreed to resolve the issue of damages by filing briefs.  *Id.* at 1.  On July 13, 2018, a scheduling order was issued noting that the undersigned was amenable to proceeding with a briefing schedule and setting deadlines for the parties.  (ECF No. 27).

---

[3] In her affidavit, Dr. Attig indicates she is "Board certified in Internal Medicine and Cardiology with a degree in Pharmacology through the University of Toledo in Ohio."  Ex. 9 at ¶4.  Although retired from her active practice since 2013, Dr. Attig maintains her license and performs part-time work from her home, reviewing medical malpractice cases.  *Id.*

On August 27, 2018, petitioner filed an affidavit describing her pain and suffering. Ex. 11 (ECF No. 28).  A few weeks later, she filed an affidavit from Thomas Attig, her father (Ex. 12, ECF No. 30), another affidavit from Dr. Elizabeth Attig (Ex. 13, ECF No. 32), and a brief in support of the amount of damages sought (ECF No. 31).

On November 1, 2018, respondent filed a brief, agreeing with the amount sought for past medical expenses but arguing that a lower amount of compensation should be awarded for petitioner's pain and suffering.  (ECF No. 35).  Petitioner did not file an optional reply to respondent's brief.  Accordingly, this case is now ripe for a determination regarding petitioner's pain and suffering award of damages.

## II.   Relevant Medical History

Petitioner received a Tdap vaccination in her left shoulder on July 14, 2016. Petition at 1; Exs. 1 at 1; 7 at 4, 6-7.  The available medical evidence of record does not reflect a history of left shoulder impairment.

Approximately two weeks following her vaccination, on July 26, 2016, petitioner presented for an orthopedic evaluation with complaints of left shoulder pain that had begun after receiving a Tdap vaccination on July 14, 2016.  Ex. 2 at 30-31.  Petitioner noted that she had awoken the day following the vaccination with "pretty severe pain in the lateral aspect of her left shoulder" and difficulty with range of motion.  *Id.* at 31. Petitioner indicated that she had contacted her primary care physician to obtain Tylenol 3, which initially provided some symptom relief; however, petitioner experienced recurrent left shoulder pain after attending a Cross Fit session.  *Id.*  Petitioner denied a history of specific injury, chronic shoulder pain, radicular symptoms, and numbness or weakness in her arm or hand.  *Id.*  On examination, petitioner was observed to have "moderate" pain with Hawkins and Neer testing, "good" range of motion, 5/5 cuff strength with pain, and tenderness laterally over the supraspinatus tendon.  *Id.* Petitioner's orthopedist assessed left subacromial bursitis and administered a subacromial steroid injection.[4]  *Id.* at 33-34.  The orthopedist also recommended a home exercise program and discussed adding physical therapy to petitioner's course of treatment if her symptoms did not improve.  *Id.*

On September 9, 2016, petitioner presented to Steadman Hawkins Clinic – Patewood with complaints of ongoing left shoulder pain that had started after receiving a prior Tdap vaccination.  *Id.* at 5-6.  Petitioner rated her current pain as a "3" out of "10" and indicated that she was experiencing a constant aching and burning.  *Id.* at 6.  An in-office x-ray of petitioner's left shoulder was unremarkable.  *Id.* at 7.  On examination, petitioner was observed to have full passive range of motion and "minor" pain in the subacromial area with impingement testing.  *Id.* at 6.  The physician recorded that

---

[4] Petitioner's orthopedist commented that it was "feasible" that her July 2016 vaccination may have been superiorly directed and caused her subacromial bursa and/or rotator cuff to become inflamed.  Ex. 2 at 33.

petitioner's rotator cuff was weak, although not significantly.  *Id.*  Petitioner was assessed with left subacromial impingement and prescribed a course of physical therapy.[5]  *Id.* at 7.

On September 23, 2016, petitioner presented to Excel Rehab & Sports - Clemson for an initial evaluation.  Ex. 3 at 6.  Petitioner reported that she had developed "left shoulder pain in the month of July after she received a tetanus injection."  *Id.*  She rated her current pain as a "3" out of "10," but noted that she had experienced pain of "10" out of "10" during the previous week.  *Id.*

Petitioner attended a total of 12 physical therapy sessions through October 28, 2016.  *Id.* at 6-40.  At her final physical therapy appointment on October 28, 2016, petitioner rated her current pain as a "1" out of "10," but noted that she had experienced pain of "4" out of "10" during the previous week.  Ex. 3 at 38.  Overall, petitioner reported improvement of her left shoulder symptoms.  *Id.*  On examination, petitioner presented with increased strength of the left shoulder; however, she was noted to experience "mild" pain to palpation over the anterior shoulder girdle.  *Id.* at 39.  Petitioner was discharged to a home exercise program.  *Id.*

On January 27, 2017, petitioner presented for a follow-up orthopedic evaluation. Ex. 2 at 14.  At that time, petitioner reported gradual improvement of her symptoms and physical functioning.  *Id.*  She described her condition as causing intermittent aching and rated her current pain as a "2" out of "10."  *Id.*  On examination, petitioner presented with full active range of motion, "slight" weakness of 5-/5, and "quite good" rotator cuff strength.  *Id.* at 15.  The orthopedist commented that petitioner's left shoulder "still does not have quite the control she has in her right shoulder," but overall concluded that her left shoulder was "much improved."  *Id.*  Petitioner's orthopedist stated that he expected petitioner's shoulder to continue improving and opined that she would not likely require surgical intervention.  *Id.* at 14.  Petitioner was ordered to follow up with her orthopedist on an as-needed basis.  *Id.* at 15.

On April 14, 2017, petitioner presented for a follow-up orthopedic appointment complaining of chronic left shoulder pain that increased with activity.  *Id.* at 22. Petitioner added, however, that she was generally tolerating her pain and her symptoms had "improved dramatically" since her first orthopedic evaluation.  *Id.*  She rated her current pain as a "1" out of "10."  *Id.*  On examination, petitioner was observed to have "excellent" rotator cuff strength and full active and passive range of motion of her left shoulder with mild bilateral directional laxity.  *Id.* at 23.  Petitioner's examination was negative for signs of impingement.  *Id.*  An in-office ultrasound of petitioner's left shoulder revealed "somewhat of a thickened bursa but intact rotator cuff."  *Id.*  Petitioner was again ordered to follow up with her orthopedist on an as-needed basis.  *Id.*

---

[5] Petitioner's physician opined that petitioner's shoulder symptoms could be "attributed to her injection as she had no antecedent history of shoulder problems."  Ex. 2 at 7.

On September 8, 2017, petitioner underwent an MRI of her left shoulder, which revealed mild tendinosis of the distal supraspinatus and subscapularis tendons and early degenerative changes within the acromioclavicular joint.  Ex. 6 at 1-3.  The MRI revealed no evidence of a partial or full-thickness rotator cuff tear.  *Id.* at 2.

On October 6, 2017, petitioner presented for a follow-up orthopedic appointment for treatment of her left shoulder condition.  Ex. 10 at 1.  Petitioner's orthopedist prescribed acetaminophen-codeine and provided a referral for physical therapy.  *Id.* at 2.  The available record does not reflect evidence of additional medical treatment for petitioner's left shoulder injury.

## III.   Affidavits Filed by Petitioner

On July 31, 2017, petitioner filed an affidavit asserting that she suffered the residual effects of her injury for more than six months and had not received an award or settlement for the injury pursuant to §11(c)(1) of the Vaccine Act.  Ex. 5.  On October 13, 2017, petitioner filed a second, more detailed affidavit from herself (Ex. 8) and an affidavit from her mother, Dr. Elizabeth Attig, who acted as her PCP (Ex. 9).

In her second affidavit, petitioner confirmed that her mother has served as her PCP from 2013 through the present.  Ex. 8 at ¶2.  Petitioner explained the reasons she has maintained this arrangement (e.g., limited health insurance) and cited past instances in which her mother had provided medical treatment and advice.  *Id.* at ¶¶3-8.  Immediately following her shoulder injury, petitioner recounted that she called her mother and was advised to seek orthopedic treatment.  *Id.* at ¶9.

In her affidavit, petitioner's mother stated that she is board-certified in internal medicine and cardiology and has served as petitioner's PCP since at least 2013.  Ex. 9 at ¶¶4-5.  She explained that, although she lives in a different state than petitioner, she is able to provide medical care by communicating with petitioner via "phone, text, email, and Face Time with active visualization and photos when indicated."  *Id.* at ¶5.  Petitioner's mother averred that petitioner had no left arm or shoulder pain prior to July 14, 2016.  *Id.* at ¶6.  Since that time, petitioner's mother alleged that petitioner has experienced daily arm pain that has necessitated specialist medical care and limited her activities of daily living.  *Id.* at ¶7.  Petitioner's mother noted that petitioner has experienced "modest improvement" of her symptoms with medical treatment.  *Id.*

On August 27, 2018, petitioner filed a third affidavit describing her pain and suffering.  Ex. 11.  Petitioner noted that, prior to her injury, she maintained a physically active lifestyle.  *Id.* at ¶2.  Following her July 14, 2016 vaccination, however, petitioner averred that her "ability to do even the most basic of physical activities was severely compromised."  *Id* at ¶3.  Petitioner explained that her pain worsened with physical activity.  *Id.*  Petitioner recounted a specific episode in the days following her vaccination in which she was unable to independently get out of bed due to her shoulder pain.  *Id.*  Petitioner explained that she was in significant distress during this episode, which caused her eight-year-old child to become upset.  *Id.*  Petitioner

otherwise emphasized how her injury affected her ability to work, sleep, perform household tasks, care for her son, and engage in recreational activities. *Id.* at ¶¶4-7. Petitioner noted that she currently experienced pain ranging from a "one" to "two" out of "ten." *Id.* at ¶8.  Describing the character of her pain as a "burning and aching that radiates from the center of [her] upper arm," she indicated that her pain worsened with coldness, wetness, weather, and exercise. *Id.*  Petitioner concluded by stating that she experienced ongoing pain without diminishment and residual weakness. *Id.* at ¶9. According to petitioner, her shoulder injury continues to limit her ability to perform physical activities. *Id.*

On September 14, 2018, petitioner filed an affidavit from Thomas Attig, her father.  Ex. 12.  In his affidavit, Mr. Attig reiterated that petitioner's injury caused continuous pain and disruption of her ability to perform activities of daily living. *Id.* at ¶¶10-11.  Drawing on his experience as an expert regarding grief and loss,[6] Mr. Attig described the significant psychological toll that petitioner's injury has had on various aspects of her life. *Id.* at ¶¶9-11.

On September 17, 2018, petitioner filed a second affidavit from Dr. Elizabeth Attig, her mother.  Ex. 13.  In her affidavit, petitioner's mother reiterated that she has served as petitioner's PCP. *Id.* at ¶4.  She asserted that petitioner did not have a history of left shoulder problems prior to her July 14, 2016 vaccination. *Id.*  As a whole, the affidavit provides a general description of petitioner's medical treatment and the physical and mental symptoms she experienced in the period following her injury. *Id.* at ¶¶5-11.  Petitioner's mother emphasized that petitioner's injury has caused longstanding disturbances of petitioner's ability to work, sleep, perform household tasks, care for her son, and engage in recreational activities. *Id.* at ¶¶6-11.  Petitioner's mother confirmed that petitioner continues to experience "constant pain that fluctuates in intensity." *Id.* at ¶11.  She opined that petitioner will "likely be in pain for the rest of her life." *Id.* at ¶12.

## IV.   Party Contentions

Petitioner requests reimbursement of $1,386.97 for past medical expenses. Petitioner's Brief ("Pet. Brief") at 1.  Respondent states that he does not object to that amount.  Respondent's Brief ("Res. Brief") at 5.  Accordingly, the only disputed issue before the undersigned is the amount of damages to be awarded for pain and suffering.

Petitioner argues that she should be awarded $100,000.00 for actual pain and suffering and an additional $5,000.00 for future pain and suffering for the year following this decision.  Pet. Brief at 6.  Petitioner asserts that "[p]etitioners in the Vaccine Program with analogous SIRVA injuries are routinely awarded comparable damages to what Ms. Attig is seeking for her personal pain and suffering." *Id.* at 4.  Petitioner compares the instant case to three prior cases in which damages were decided by the undersigned. *Id.* at 4-5.  Specifically, petitioner cites: *Knauss v. HHS*, No. 16-1372V,

---

[6] In his affidavit, petitioner's father indicated that he is a professor and author of three books on grief and loss.  Ex. 12 at ¶9.

2018 WL 3432906 (Fed. Cl. Spec. Mstr. May 23, 2018) (awarding $60,000.00 for pain and suffering and $170.00 for unreimbursable expenses), *Dhanoa v. HHS*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018) (awarding $94,900.99 for pain and suffering and $862.15 for unreimbursable expenses), and *Marino v. HHS*, No. 16-622V, 2018 WL 2224736 (Fed. Cl. Spec. Mstr. Mar. 26, 2018) (awarding $75,000.00 for actual pain and suffering and emotional distress and $88.88 for unreimbursable expenses). *Id.*

Petitioner emphasizes that her injury caused pain and difficulty with mobility and impacted her family, physically-active lifestyle, and performance at work. *Id.* at 5. Petitioner alleges that her injury forced her to rely on her eight-year-old son to perform household activities and self-care. *Id.* at 5-6. Petitioner also notes that her work as a teacher and author was negatively impacted by her left shoulder pain. *Id.* at 6. Petitioner states that her quality of life with her son was "hindered as a result of her vaccination and resulting left shoulder injury." *Id.*

Respondent argues that petitioner should be awarded $67,500.00 in compensation for past and future pain and suffering. Res. Brief at 6. Respondent explains that his approach in determining this figure was informed by the Court's prior evaluation of contested SIRVA claims. *Id.* at 9-10. Respondent contends that the medical evidence in this case reflects a "mild, temporary partial disability in the use of [petitioner's] left arm as a result of her vaccine injury." *Id.* at 10. In support of this claim, respondent notes that petitioner underwent only one round of physical therapy and did not have surgery to repair any abnormal shoulder pathology. *Id.* at 11. Respondent cites petitioner's medical records from April 14, 2017 as reflecting improvement of her left shoulder symptoms. *Id.* Respondent maintains that the last available medical record dated October 6, 2017 is not reflective of a significant left shoulder injury. *Id.*

Respondent acknowledges that petitioner's left shoulder "appears to bother her still." *Id.* at 10-11. Nevertheless, respondent argues that the medical record in this case "fails to substantiate petitioner's claim that she has suffered a severely painful, permanent, and incapacitating injury to her left shoulder." *Id.* at 11. According to respondent, the proposed award "takes into consideration petitioner's claim that her quality of life has been impacted by her shoulder injury over the past several years." *Id.* at 10.

## V.   **Legal Standard**

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." § 15(a)(4). Additionally, petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined

to be reasonably necessary." § 15(a)(1)(B). Petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. HHS*, No. 93-92V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. HHS*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. HHS*, No. 93-172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[7] *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. HHS,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

The undersigned may also look to prior pain and suffering awards to aid in her resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. HHS*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, the undersigned may also rely on her own experience adjudicating similar claims.[8] *Hodges v. HHS*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims). Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum. *See Graves v. HHS*, 109 Fed. Cl. 579 (2013).

## VI. Discussion

### A. Actual Pain and Suffering

In her brief, petitioner compares the instant case to *Knauss*, *Dhanoa*, and *Marino*. Pet. Brief at 4-5. The undersigned is mindful of the aforementioned decisions; however, in determining an award in this case, the undersigned does not rely on a single decision. Rather, the undersigned has reviewed the particular facts in this case, giving due consideration to the circumstances and damages in other cases cited by the

---

[7] In this case, awareness of the injury is not in dispute. The record reflects that at all relevant times petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, the undersigned's analysis will focus principally on the severity and duration of petitioner's injury.

[8] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. Since that time, all SPU cases, including the majority of SIRVA claims, have remained on the undersigned's docket.

parties as well as her knowledge and experience adjudicating similar cases.  Upon the undersigned's review of the complete record in this case and in consideration of the undersigned's experience evaluating SIRVA claims, the undersigned finds that an award of $75,000.00 is appropriate for petitioner's past pain and suffering.

As described above, petitioner reported left shoulder pain at a medical appointment approximately two weeks following her Tdap vaccination on July 26, 2016. Ex. 2 at 30-31.  Her physician assessed left subacromial bursitis and administered a cortisone injection.  *Id.* at 33-34.  Petitioner's decision to seek prompt medical treatment and undergo a cortisone injection at her first appointment suggests she experienced significant pain in the period immediately following her vaccination.[9]  However, petitioner's medical records indicate her condition rapidly improved following the cortisone injection and her subsequent course of physical therapy from September 23, 2016 to October 28, 2016 (12 sessions in total).  Ex. 3 at 6-40.

Indeed, in the months following her July 26, 2016 medical appointment, petitioner reported significant improvement of her pain, strength, and physical functioning.  *See, e.g.*, Exs. 2 at 14-15, 22; 3 at 38.  She consistently rated her current pain as ranging from a "1" through "3" out of "10."  *See, e.g.*, Exs. 2 at 6, 14, 22; 3 at 38.  These ratings suggest petitioner's pain levels were of a relatively mild nature.  By contrast, the petitioner in *Dhanoa* frequently suffered pain levels of at least "9" at her post-vaccination medical appointments.  *Dhanoa*, 2018 WL 1221922, at *3-5.  The petitioner in *Dhanoa* further required two cortisone injections, attended almost twice the amount of formal physical therapy, experienced significant reduction in movement, and suffered the effects of her injury for a longer duration.[10]  *Id.*

The impact of petitioner's injury on her daily life is also taken into account. Petitioner has described how her injury affected her ability to work, sleep, perform household tasks, care for her son, and engage in recreational activities.  Ex. 11 at ¶¶4-7.  Due to her injury, petitioner indicated that she is no longer able to maintain a physically active lifestyle.[11]  Ex. 11 at ¶¶2-3.  Petitioner also noted that, in the period

---

[9] Although petitioner reported significant pain, she experienced only mild limitations in movement and strength.  *See, e.g.*, Ex. 2 at 6 ("[f]ull passive range of motion" and minor pain with active); 15 ("full active range of motion . . . [and] a slight amount of weakness"); 33 ("good range of motion").

[10] In her brief, petitioner asserts that the *Dhanoa* petitioner underwent 13 physical therapy sessions.  Pet. Brief at 4.  However, diagnosed with adhesive capsulitis, the petitioner in *Dhanoa* actually underwent 23 physical therapy sessions from December 2014 through October 2015.  *See Dhanoa*, 2018 WL 1221922, at *3-4.  The undersigned further notes that the petitioner in *Dhanoa* received treatment for over three years whereas the petitioner in the current case received treatment for approximately 15 months.  *Id.* at *3-5.  In her brief, petitioner acknowledges the significant disparity in the duration of treatment but nevertheless seeks $15,000 more for past pain and suffering than was awarded to the petitioner in *Dhanoa.*  Pet. Brief at 1, 4-5.  Petitioner does not provide an explanation for this discrepancy.

[11] The undersigned finds petitioner's statements regarding the existence of ongoing physical limitations to be credible.  However, as discussed *supra*, petitioner's medical records as a whole reflect significant improvement of her symptomatology and functioning in the months following her vaccination.  Exs. 2 at 6

immediately following her vaccination, her "ability to do even the most basic of physical activities was severely compromised." *Id.* at ¶3.  Petitioner explained that her limited functional ability and pain caused her eight-year-old child to become upset. *Id.*  As a whole, the affidavits filed by petitioner reiterate that petitioner's injury caused physical and emotional distress and led to significant disruptions of her ability to work, care for her family, and perform recreational activities.[12]  Exs. 5, 8-9, 11-13.

Overall, the undersigned finds that petitioner's injury was of a relatively brief duration for a SIRVA.  She was vaccinated in July 2016 and appears to have largely recovered by April 2017.  At an orthopedic appointment on April 14, 2017, petitioner complained of chronic shoulder pain that increased with activity; however, she indicated that she was generally tolerating the pain and that her symptoms had "improved dramatically" since her first orthopedic evaluation.  Ex. 2 at 22.  She rated her current pain as a "1" out of "10." *Id.*  On examination, petitioner was observed to have "excellent" rotator cuff strength and full active and passive range of motion of her left shoulder with only mild bilateral directional laxity. *Id.* at 23.  Petitioner's examination was negative for signs of impingement. *Id.*  Petitioner was ordered to follow-up with her orthopedist on an as-needed basis. *Id.*  As indicated in respondent's brief, petitioner did not undergo surgery to repair any abnormal shoulder pathology.  Res. Brief at 11.

The undersigned finds the *Marino* decision to be helpful in determining the appropriate award for petitioner's past pain and suffering.  Although the current case differs from *Marino* regarding the timing, duration, and frequency of treatment, the overall facts of both cases suggest a similar degree of shoulder impairment.  As with *Marino*, petitioner in the current case underwent one MRI and one steroid injection.  Exs. 2 at 34; 6 at 1-3; *Marino*, 2018 WL 2224736, at *2-3.  Both petitioners reported significant pain at their initial medical evaluations.  Ex. 2 at 30-31; *Marino*, 2018 WL 2224736, at *2-3.  Like *Marino*, petitioner reported significant disruption of her employment duties and physically active lifestyle.  Ex. 11; *Marino*, 2018 WL 2224736, at *4-5.

In her brief, petitioner distinguishes *Marino* by noting that she sought medical attention sooner and received more treatment following her vaccination.  Pet. Brief at 5.  However, the *Marino* petitioner provided credible explanations for both her delay in

---

(September 9, 2016 visit), 14-15 (January 27, 2017 visit), 22 (April 14, 2017 visit); 3 at 38 (October 28, 2016 discharge from PT).  And as described in Section (VI)(B), the available record does not support an award for future pain and suffering.

[12] In *Desrosiers v. HHS*, No. 16-0224V, 2017 WL 5507804 (Fed. Cl. Spec. Mstr. Sep. 19, 2017) (awarding $85,000.00 for pain and suffering and $336.20 for unreimbursable expenses), the petitioner similarly averred that her shoulder injury impacted her ability to care for her child.  *Desrosiers*, 2017 WL 5507804, at *4.  However, the *Desrosiers* petitioner's shoulder injury occurred during the course of her pregnancy and continued to affect her following the birth of her son.  *Id.* at *1-4.  The *Desrosiers* petitioner was prevented from taking more effective prescription pain medication during her pregnancy and stated that her shoulder injury impacted her ability to perform "the most basic duties of a new mother," including nursing and comforting her infant son.  *Id.* at *4.

seeking treatment and lack of ongoing medical care.  Among other things, the *Marino* petitioner cited her busy work schedule, tennis league, and family obligations.  *Marino*, 2018 WL 2224736, at *2-3.  The *Marino* petitioner further noted that she had been a nurse practitioner for 15 years and was therefore able to provide some level of self-care. *Id.* at *3.

Although petitioner in the instant case sought medical attention sooner and received additional treatment following her vaccination, the undersigned notes that the radiographic imaging in *Marino* revealed more significant shoulder pathology. Specifically, the April 2015 MRI in *Marino* revealed mild-to-moderate tendinosis and a tiny anterior peripheral leading edge bursal surface partial tear of the supraspinatus tendon.  *Id.* at *2.  By contrast, a September 2017 MRI of petitioner's left shoulder in the current case revealed only mild tendinosis of the distal supraspinatus and subscapularis tendons and early degenerative changes within the acromioclavicular joint. Ex. 6 at 1-3. In summary, the overall facts of both cases suggest a similar degree of shoulder impairment.  Based on all of the information above, the undersigned finds that an award of $75,000.00 is appropriate for petitioner's past pain and suffering.

### B. Projected Pain and Suffering

Petitioner argues in her brief that she should be awarded $5,000.00 for future pain and suffering for the year following this decision. Pet. Brief at 6.  However, the undersigned does not find preponderant evidence to support future damages.

In making this finding, the undersigned has considered petitioner's brief and affidavits.  As noted above, petitioner filed an affidavit dated approximately two years following her vaccination in which she reported experiencing "pain every moment of every day." Ex. 11 at ¶8.  She noted that her symptoms continued to affect her work and activities of daily living.  *Id.* at ¶9.  Petitioner filed an affidavit from her father from the same period that also described residual symptoms. Ex. 12 at ¶8.  On September 17, 2018, petitioner filed an affidavit from her mother, a board-certified internist and cardiologist who has served as petitioner's primary care physician. Exs. 9, 13.  In her affidavit, petitioner's mother averred that petitioner continues to experience residual pain, weakness, sleep disturbance, and loss of functioning in her left arm. Ex. 13 at ¶¶9, 11.  Petitioner's mother opined that petitioner "will likely be in pain for the rest of her life." *Id.* at ¶12.  She added that petitioner's pain will "limit her ability to work as well as to enjoy all of the physical activities that she once enjoyed more than anything else." *Id.*

Taken together, petitioner's affidavits maintain that her injury will cause ongoing pain and disruption of her ability to perform activities of daily living.  Nevertheless, the undersigned finds the affidavits to be inconsistent with the available medical evidence of record in this case.  This is significant because medical records are the most reliable evidence regarding a petitioner's medical condition.  *Shapiro* v. *HHS*, 101 Fed. Cl. 532, 537-38 (2011) ("[t]here is little doubt that the decisional law in the vaccine area favors

medical records created contemporaneously with the events they describe over subsequent recollections."). Indeed, as described above, petitioner's medical records reflect improvement of her left shoulder condition with treatment. For example, at an orthopedic evaluation on January 27, 2017 following her discharge from physical therapy, petitioner reported intermittent aching but presented with full active range of motion, only "slight" weakness of 5-/5, and "quite good" rotator cuff strength. Ex. 2 at 15. The orthopedist commented that petitioner's left shoulder was "much improved" and opined that he expected further improvement of her condition. *Id.* at 14-15. Notably, the orthopedist declined to recommend surgical intervention and ordered petitioner to return on an as-needed basis only. *Id.*

At a follow-up orthopedic appointment on April 14, 2017, petitioner reported left shoulder pain with activity but stated that her symptoms had "improved dramatically" since her first orthopedic evaluation. *Id.* at 22. On examination, petitioner was observed to have "excellent" rotator cuff strength and full active and passive range of motion of her left shoulder with only mild bilateral directional laxity. *Id.* at 23. Petitioner was again ordered to follow-up with her orthopedist on an as-needed basis only. *Id.*

These medical records suggest petitioner made significant progress with treatment and was expected to experience further improvement. The record does not reflect evidence of additional medical treatment for petitioner's left shoulder after October 6, 2017. Taken together, petitioner's medical records and lack of ongoing treatment are inconsistent with the degree of symptoms alleged in petitioner's affidavits.

The undersigned acknowledges that petitioner's mother is a board-certified internist and cardiologist who has served as petitioner's primary care physician since at least 2013. Ex. 9 at ¶¶4-5. Petitioner's mother stated that petitioner will likely experience lifelong pain and functional limitations. Ex. 13 at ¶¶11-12. However, the undersigned does not find these statements to constitute preponderant evidence to support an award for future pain and suffering. Initially, there is no evidence that petitioner's mother possesses additional training, certification, or expertise in orthopedic medicine. Even if such evidence were furnished, the record does not contain medical records from petitioner's mother to evaluate the basis or supportability of her opinion. Thus, there are no physical examinations or assessments of petitioner's shoulder by her mother. As already noted, the record contains a statement from petitioner's orthopedist from January 2017 indicating that petitioner's shoulder condition was expected to improve. Ex. 2 at 14. There are no other statements or opinions from petitioner's medical providers to support an award of future pain and suffering. The undersigned notes that petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer*, 1996 WL 147722, at *22-23. Based on the information above, the undersigned does not find preponderant evidence to support an award of future pain and suffering in this case.

## VII.    Conclusion

In determining an award in this case, the undersigned does not rely on a single decision or case.  Rather, the undersigned has reviewed the particular facts and circumstances in this case, giving due consideration to the circumstances and damages in other cases cited by the parties and other relevant cases, as well as her knowledge and experience adjudicating similar cases.  In light of all of the above, and in consideration of the record as a whole, the undersigned finds that petitioner should be awarded $75,000.00 in compensation for actual (or past) pain and suffering and $1,386.97 in compensation for medical expenses as stipulated by the parties.  The undersigned makes no award for projected pain and suffering, future medical expenses, or past or future lost wages.

**Accordingly, the undersigned awards petitioner a lump sum payment of $76,386.97, representing $75,000.00 in compensation for actual pain and suffering and $1,386.97 in compensation for actual unreimbursable expenses, in the form of a check payable to petitioner, Sheryl Attig.**  This amount represents compensation for all damages that would be available under § 15(a).

The clerk of the court is directed to enter judgment in accordance with this decision.[13]

**IT IS SO ORDERED.**

**s/Nora Beth Dorsey**
Nora Beth Dorsey
Chief Special Master

---

[13] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.